| | | |
|---|---|---|
| RESTAURANT SUPPLY SOLUTIONS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 3:04-0786 |
| v. | ) ) | JUDGE ECHOLS |
| DEAN LEISCHOW, individually and d/b/a THE LEISCHOW GROUP, INC., LGI ENERGY SOLUTIONS, INC., | ) ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM

Plaintiff Restaurant Supply Solutions, Inc. ("RSSI") brought suit against Defendants LGI Energy Solutions, Inc. ("LGI") and Dean Leischow individually ("Leischow") for breach of contract, fraud in the inducement to contract, fraudulent misrepresentation, and intentional, bad faith refusal to pay commissions, in violation of Tenn. Code Ann. § 47-50-114, which, if proved, would entitle RSSI to treble damages, attorney's fees and court costs.[1] Defendant LGI brought a counterclaim against RSSI for breach of contract. The Court conducted a bench trial in this case June 26 through July 3,

---

[1] Because Plaintiff terminated its contract with LGI in June 2004, Plaintiff does not pursue the fraudulent inducement claim to obtain rescission of contract as a remedy. Plaintiff seeks damages for misrepresentation and breach of contract, as well as the trebling of the amount of commissions found to be due and untimely paid under Tennessee statute. (Docket Entry No. 200, Plaintiff's Proposed Findings of Fact and Conclusions of Law at 40.)

1

2007.  The Court now enters its Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

## A.  Adoption of factual findings

At the conclusion of the bench trial, the Court asked counsel for the parties to submit proposed findings of fact and conclusions of law.  The Court has carefully reviewed its own notes taken during the trial, as well as the trial transcript and the written submissions of the parties.

The Court finds that a portion of the Plaintiff's Findings of Fact and Conclusions of Law (Docket Entry No. 200), which appear at pages 1 to 29 of Plaintiff's filing (up to the section on page 29 entitled, "Other Damages"), accurately reflects the testimony and evidence presented at the bench trial as to the various subjects addressed in pages 1 to 29, with two exceptions:

*1.  First exception concerning seven percent (7%) factor*

The Court does not incorporate into this Memorandum two sentences included in the Plaintiff's proposed findings of fact in the subsection entitled, "The Amendment to the Contract," appearing on pages 24 and 25 of Docket Entry No. 200.  The Court does not accept and incorporate the fifth sentence of the second paragraph on page 24 which states: "The amendment never went into effect because the sales numbers were never within 7% of projections. (Ex. 125)."  The Court also does not accept and incorporate the

2

fourth sentence of the second full paragraph on page 25 which states: "Mr. Leischow chose not to use the plus or minus 7% provision in the amendment."

The Court also does not incorporate into this Memorandum one sentence in the subsection entitled, "The Termination." In the first full paragraph on page 26, the Court does not accept the fourth sentence, which reads: "The 7% factor was no longer applied after the termination. (Tr. p. 348)."

2. *Second exception on failure of witnesses Kirkwood and Bruce to testify*

The Court does not accept and incorporate the last sentence of footnote 12 appearing on pages 28-29 of Plaintiff's submission. (Docket Entry No. 200.) There is no evidence in the trial record to substantiate the statement: "Both witnesses [Kirkwood and Bruce] refused to testify on behalf of RSSI at this trial because of the threat of enforcement of those contractual provisions by Mr. Leischow."

Other than the statements specified in the two exceptions mentioned above, the Court hereby incorporates by reference into this Memorandum Plaintiff's statement of facts at pages 1-29.

The Court does not accept and incorporate the subsection "Other Damages" at pages 29 to 37 of Plaintiff's submission.

The Court accepts and incorporates by reference the subsection entitled, "The Counterclaim" at pages 37 and 38 of Plaintiff's submission.

3

The Court does not accept and incorporate the subsection "The California Pizza Kitchen Contract" at pages 38 and 39 of Plaintiff's submission.

The Court also finds that paragraphs 13-21, 25-47, 60, and 71-78 of the Defendants' Proposed Findings of Fact and Conclusions of Law (Docket Entry No. 201), accurately reflect the testimony and evidence presented at the bench trial as to the various subjects addressed in those paragraphs, and the Court hereby incorporates those paragraphs by reference into this Memorandum.

Hereinafter the Court presumes the reader's familiarity with these findings presented by the parties and accepted by the Court.

**B. Court's additional factual findings**

The Court now makes additional findings of fact. The Court's findings with regard to damages will be discussed later in this opinion. To the extent the parties' proposed findings of fact and conclusions of law have not been accepted and incorporated herein by reference or are different from those now entered by the Court, the parties' proposed findings and conclusions are hereby rejected.

*1. Misrepresentations and omissions*

The Court finds by a preponderance of the evidence that Defendant Leischow, acting for himself and on behalf of Defendant LGI, made a number of material misrepresentations and omissions of fact to RSSI, Stapleton and Getreu before the parties entered into the Work for Hire Agreement ("the Agreement") in 2002. The Court

4

finds that the testimony of Shane Stapleton and John Getreu was more credible on the disputed issues than the testimony of Defendant Dean Leischow. Specifically, Defendant Leischow:

(a) misrepresented the status of his business entity during the negotiations leading up to the signing of the contract and at the time that the Agreement was signed by RSSI. He also misrepresented the status of his business entity to RSSI's clients. Defendant Leischow operated as a sole proprietor until he domesticated Net Search, Inc. in Minnesota and changed its name to LGI Energy Solutions, Inc. in May 2002. Leischow did not disclose to RSSI, Stapleton, and Getreu before the Agreement was signed that he was operating as a sole proprietor. Rather, he presented Stapleton with a business card representing his company to be "The Leischow Group, Inc." and subsequently entered into the Work for Hire Agreement with RSSI using the name, "The Leischow Group, Inc." The Court finds Defendant Leischow's testimony that he had never represented The Leischow Group, Inc. to be a Minnesota corporation is not credible because he had entered into contracts with Lifetime Fitness, Ulta, Inc., Enternext Group and Central Parking Corporation as "The Leischow Group, Inc., a Minnesota corporation." The fact that Leischow later entered into the amendment with RSSI as LGI Energy Solutions, Inc., does not obviate the effect of his earlier misrepresentations.

5

(b)    Defendant    Leischow    misrepresented    his    business capabilities.    He represented that he was processing 150,000 utility invoices for clients per month, at a time when he was, in fact, not processing any invoices.  A subcontractor, Entech, Inc., processed approximately 150,000 utility invoices per month, but of those, Entech processed less than one thousand invoices for LGI. Entech and LGI had entered into an agreement that allowed LGI to utilize Entech's proprietary online system, but that agreement did not give Leischow authority to misrepresent the capabilities of LGI to prospective clients.  Defendants Leischow and LGI did not have the capability to process large numbers of utility invoices in-house at the time the Agreement was signed, but they led RSSI and prospective clients to believe that LGI had such capability. Leischow led RSSI and its clients to believe that he had developed SMRTPOWER when in fact Entech had developed that online system. Contrary to Leischow's representation, he did not possess a federal trademark on SMRTPOWER.

(c) Defendant Leischow misrepresented his clientele to RSSI and RSSI's clients.  He claimed that he was doing substantial business with major companies such as Target, Walmart, General Motors, Sony, Barclays Bank, Borders Books, Xerox and IBM when, in fact, all of these clients were Entech's and Leischow was not deriving any income from any of them.  He gave RSSI a false customer list to pass on to their clients, a false list of

6

"customer successes" and "additional customer successes," and a false list of references. He gave a false reference list to Jack-in-the-Box.

(d) Defendant Leischow misrepresented the number of employees he had, stating that he had twenty employees, including six tariff analysts. Leischow knew that, at the time he signed the Agreement with RSSI, he had only one assistant.

(e) Defendant Leischow misrepresented his financial status to prospective customers, and in particular to Jack-in-the-Box. He grossly overstated his actual and projected revenues in order to land a contract with Jack-in-the-Box. The Court finds that the testimony of Philip Williams from Jack-in-the-Box was more credible than the testimony of Leischow concerning the misrepresentations Leischow made to Williams to obtain the Jack-in-the-Box contract and Williams' reliance on those representations.

The Court further finds that Leischow and LGI continued to make material misrepresentations and omissions to RSSI, Stapleton and Getreu from the execution of the Agreement in early 2002 continuing to the time of trial. The Court finds that Leischow and LGI did not disclose accurately the amount of revenue RSSI's clients generated for LGI, nor did they disclose accurately the direct costs fairly attributed to RSSI business. The Court finds that Leischow and LGI charged certain costs against RSSI, such as a Leischow family vacation and construction expenses for Leischow's

7

personal home in Minnesota, when such costs did not in any way relate to the direct costs of RSSI's business. The Court further finds that LGI and Leischow charged excessive travel expenses to RSSI without proper business documentation of such charges and without justifying the need for such expenses.

The Court finds that Defendant Leischow inflated LGI sales and revenue figures in presentations and brochures given to prospective RSSI clients in order to induce restaurant chains to enter into contracts with LGI. Once contracts were signed, Defendant Leischow and LGI did not deliver on the representations and promises they made to the clients concerning the capabilities of SMRTPOWER and LGI's ability to process and pay utility invoices in a timely and accurate manner. These failures at times also impacted LGI's ability to fulfill demand-side projects for clients. As a result, excessive late fees were incurred for untimely payment of utility bills which were charged to RSSI; some RSSI clients terminated their contracts with LGI early, resulting in lost revenue; and RSSI suffered damage to its reputation with its clients and lost future business with them.

The Court finds that Defendant Leischow made all of these misrepresentations knowingly and with fraudulent intent. The Court further finds that even if the misrepresentations made to RSSI by LGI were not known to be false, they were recklessly made without regard to the truth. The Court also finds that RSSI, Stapleton,

8

and Getreu relied on the material misrepresentations and omissions of Leischow and LGI when RSSI agreed to enter into the Work for Hire Agreement with LGI. The Court further finds that RSSI would not have entered into the Agreement and its amendment but for these material misrepresentations and omissions by Leischow and LGI. The Court finds that RSSI has been damaged by these misrepresentations, as set forth below.

The entire course of conduct in which Defendants Leischow and LGI engaged casts a long shadow over Defendant Leischow's trial testimony. In light of the many misrepresentations and omissions made by Leischow and LGI, the Court finds that the testimony of Stapleton, Getreu, and Williams was more credible than the testimony of Defendant Leischow.

2. *Expert testimony*

During discovery, Defendants LGI and Leischow failed to produce to Plaintiff in response to discovery requests a large number of important financial documents of LGI. Defendants' failure to produce the requested financial documents obstructed Plaintiff's preparation for trial on an ongoing basis as trial dates were continued. As trial dates approached, Defendants produced some documents previously withheld and made payments to Plaintiffs representing unpaid commissions. The lack of financial documentation produced by Defendants made it particularly difficult for Plaintiff's expert to make accurate determinations about

9

Defendants' books and records and to make calculations of Plaintiff's damages.

On October 5, 2005, the Magistrate Judge granted Plaintiff's motion to compel and ordered Defendants to produce requested documents. (Docket Entry No. 46.) Defendants did not comply with the Magistrate Judge's Order. On December 19, 2005, the Magistrate Judge granted Plaintiff's Rule 37 motion for sanctions (Docket Entry No. 90) due to Defendants' failure to comply with the Court's previous Order.

In the sanctions Order, the Magistrate Judge ruled that this Court, as the finder of fact, should draw an adverse inference against Defendants for their failure to produce a substantial number of deposit tickets missing in the years 2004 and 2005 and for their failure to produce copies of LGI's canceled checks. (Id. at 3-5.) Moreover, the Magistrate Judge ruled:

> To the extent an expert witness testifies that additional source documents should have been maintained by the defendants, the defendants will be subject to an adverse inference. To the extent other experts say that these documents are unnecessary or not kept in the ordinary course of business, then the defendants may attempt to rebut such an inference.

(Id. at 4.) Specifically with regard to American Express statements and travel expenses, the Magistrate Judge ruled:

> It does not appear that the defendants have produced the American Express statements, and the defendants contend that these are all the records they keep. The Court cannot order the defendants to produce documents they do not have. The plaintiff's expert is certainly free to draw such conclusions as are warranted from the lack of justification for expenses, and the defendants' expert is free to opine that such records are sufficient. The

10

trier of fact may then decide whether expenditures are
            justified or not.

(Id. at 5-6.)

        Defendants LGI and Leischow have maintained throughout the
litigation that LGI does not in the ordinary course of business
keep back-up documentation for Defendant Leischow's travel
expenses; rather LGI keeps and relies only on American Express
statements to substantiate Defendant Leischow's travel.
Defendants' expert, Harold Dahl, testified that he reviewed and
relied solely on the Defendants' American Express statements and he
accepted at face value Defendant Leischow's representations as to
the necessity of certain travel expenses and Defendant Leischow's
decision to charge such costs against RSSI revenue.   Neither
Plaintiff's expert, Mr. Robert Whisenant, nor Defendants' expert,
Mr. Dahl, were able to review any back-up documentation for
Defendant Leischow's travel expenses.

        In determining the amount of damages owed to the Plaintiff,
the Court will draw adverse inferences against Defendants to the
extent necessary to reach a decision due to their failure to
produce requested documentation in a timely manner so that
Plaintiff and its expert could prepare for trial.   Plaintiff's
expert prepared an initial expert report and a supplemental report
(Pl. Exs. 92 & 93) in an effort to address Defendants' late
production of documents and the ever-changing picture of
Defendants' business. (Trial Tr. 569-570, 572, 575.)  Plaintiff's

                                  11

damages figure continued to rise because documents produced late by LGI impacted the damages calculation. (Trial Tr. 349-350, 358-359.) Nonetheless, Defendants' business remained a moving target. Defendants' recalcitrance in failing to produce documents has created extreme hardship for Plaintiffs, their expert and this Court in trying to understand what Defendants' business documents actually show. The Court finds that Defendants engaged in a pattern of obfuscation before and during this litigation to prevent Plaintiff and the Court from obtaining an accurate evaluation of Defendants' calculation of gross margin and commissions due to Plaintiffs. Moreover, because the Court has already found that much of Defendant Leischow's testimony is not to be believed, the Court will not accept at face value his explanation as to why particular travel was necessary and why certain business expenses were charged against RSSI revenue.

### 3. Gross margin

The Agreement of the parties did not define the term, "gross margin." Based on the testimony of Stapleton, Plaintiff's expert Robert Whisenant, and Defendants' expert Harold Dahl, the Court finds that "gross margin" meant sales revenue less direct costs.

### 4. RSSI's customer support after terminating Agreement

Plaintiff presented a compilation of emails entitled "Account Management Assistance Provided to LGI, October 2003 to December 2004." (Pl. Ex. 128.) Stapleton testified that RSSI continued to

12

provide management assistance and client support even after RSSI terminated the Agreement with LGI. (Trial Tr. at 187.) The Court finds that RSSI did provide management assistance and client support while the Agreement and the amendment were in effect and after RSSI terminated the Agreement and the amendment. The Court does not credit Leischow's testimony that RSSI abandoned its responsibility to provide management assistance in 2004 and after. Leischow specifically instructed Stapleton not to contact clients directly shortly after RSSI terminated the Agreement and its amendment. (Pl. Ex. 128, July 7 & November 19, 2004 emails.)

   *5. California Pizza Kitchen*

   After terminating the contractual relationship with LGI in June 2004, in December 2004 RSSI entered into a separate agreement with one of the clients they obtained for LGI, California Pizza Kitchen ("CPK"). Karen Settlemyer of CPK contacted Stapleton and Getreu and asked them to audit Defendant Leischow's services relating to a supply-side project LGI did for CPK. Specifically, Settlemyer was concerned that numbers on savings reports she received from LGI continued to change. She questioned the validity of LGI's charges to CPK for savings fees if late charges were included. She asked RSSI to determine whether deposits were made, but were not put into the correct accounting format for eventual reimbursement. RSSI audited CPK's bills from January 1, 2005 through July 2006. (Trial Tr. 318.)

13

The Court finds that this contractual relationship between RSSI and CPK strained LGI's relationship with CPK. Although RSSI had terminated its contract with LGI before accepting this audit work for CPK, RSSI was nonetheless entitled to receive commissions on CPK income until the expiration of the 36-month LGI-CPK contract in late 2006. In conducting the audit CPK requested, RSSI did not use any documents obtained from LGI, but Stapleton and Getreu talked directly to CPK's energy suppliers at CPK's direction about some of the invoices from LGI. RSSI expressed its opinion to CPK as to the validity of information that CPK was receiving from LGI.

LGI claimed that an error appeared in RSSI's audit for CPK. LGI contacted RSSI numerous times asking for a correction to the audit, but RSSI did not provide it. (Def. Exs. 293, 296-299.) Based on the information RSSI provided, CPK eventually stopped paying LGI from the fourth quarter of 2005 forward. As a result, LGI filed an arbitration action against CPK claiming more than $100,000. (Def. Ex. 300.) The claim eventually was settled with CPK for $77,872.36. (Def. Ex. 325.) Approximately 45 days after receiving the CPK settlement proceeds and shortly before a prior trial date in this case, LGI paid RSSI $87,003.02. This figure represented RSSI's share of the settlement proceeds, plus previously unpaid commissions LGI owed to RSSI.

The Court finds that RSSI's conduct of the audit for CPK was a breach of Section 1 of the Agreement and that LGI suffered

damages as a result.  The Court accepts LGI's calculation of those damages for breach in the amount of $23,429.  (Def. Ex. 332.)

   *6.  Buffalo Wild Wings*

   On March 21, 2003, Stapleton sent an email to his contact at Buffalo Wild Wings, Kathy Sorenson, providing extensive information about how LGI's services could benefit the restaurant chain.  (Pl. Ex. 24.)  Stapleton was not successful in convincing Buffalo Wild Wings to enter into a contract with LGI at that time.  Stapleton told Defendant Leischow about his communications with Buffalo Wild Wings.  In February 2004, Leischow informed Stapleton by email that Leischow would handle Buffalo Wild Wings and if Leischow needed RSSI's help he would ask for it.  Leischow promised to keep Stapleton informed about his progress with Buffalo Wild Wings, but he did not do so.  LGI entered into a contract with Buffalo Wild Wings in late 2004, after RSSI terminated its contract with LGI.  RSSI did not receive any commission based on revenue LGI received from Buffalo Wild Wings.  (Trial Tr. 84-86.)

   Because Stapleton made the initial sales overture to Buffalo Wild Wings in 2003, the Court finds that the account is covered by the Work for Hire Agreement.  RSSI is entitled to commission on the Buffalo Wild Wings revenue.

## II.  STANDARD OF PROOF

   Plaintiff is required to prove each and every element of each claim by a preponderance of the evidence.  <u>State by Humphrey v.</u>

15

<u>Alpine Air Prods., Inc.</u>, 500 N.W.2d 788, 793 (Minn. 1993); <u>McConkey</u>
<u>v. Continental Ins. Co.</u>, 713 S.W.2d 901, 904 (Tenn. Ct. App. 1984).

## III. CONCLUSIONS OF LAW

The Agreement between RSSI and LGI provided that "[t]his
agreement shall be subject to the laws of the State of Minnesota."
(Pl. Ex. 1 ¶ 11.)  The Court will consider both Minnesota and
Tennessee law, as the law of these two states on the claims is
similar.

### A. Misrepresentation

Under Minnesota law, the elements of fraudulent
misrepresentation are (1) a representation; (2) that is false; (3)
that pertains to a past or present fact; (4) that is material; (5)
that is susceptible of knowledge; (6) which the representer knew
was false or asserted as his or her own knowledge without knowing
whether it was true or false; (7) which the representer made with
the intent to induce another to act or be justified to act upon it;
(8) which did induce or justify another to act; (9) the person
acted in reliance upon the representation; (10) the person suffered
damage; and (11) the representation was the proximate cause of the
damage.  <u>Benson v. Rostad</u>, 384 N.W.2d 190, 194 (Minn. Ct. App.
1986).  Where a promise is concerned, there must be some
affirmative evidence that the promisor did not intend to perform at
the time he made the promise.  <u>Id.</u>

16

Under Tennessee law, the elements of fraudulent misrepresentation are: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation. Metropolitan Gov't. of Nashville and Davidson County v. McKinney, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992). If the claim is based on promissory fraud, the misrepresentation must embody a promise of future action without the present intention to carry out the promise. First Nat'l Bank v. Brooks Farms, 821 S.W.2d 925, 927 (Tenn. 1991); Stacks v. Saunders 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990). The terms, "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are synonymous. Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901, 904 n.1 (Tenn. 1999).

The Court concludes that Plaintiff has proven its claim of misrepresentation by a preponderance of the evidence whether Minnesota or Tennessee law is applied. The Court expressly found above that Defendant Leischow, for himself and on behalf of LGI, made a number of material misrepresentations to RSSI, Stapleton and Getreu prior to and during the contractual relationship between RSSI and LGI.

17

The Court concludes that the intentional representations Defendants made (and which are specified above in this Memorandum) were false or made with reckless disregard for the truth, pertained to past or present facts, were material, were susceptible of knowledge, were known by Defendants to be false or recklessly made, were made by Defendants with the intent to induce RSSI to act or be justified to act upon the representations, RSSI was so induced or justified to act, RSSI acted in reliance upon the representations and suffered damages, and the representations were the proximate cause of RSSI's damage.

RSSI relied not only on Defendants' explicit representations, but on Defendant Leischow's guidance and instruction when he made presentations to prospective clients and included in the presentations to those clients the same misrepresentations he made to RSSI, Stapleton and Getreu. Not knowing at the time that Defendants' representations were untrue, Stapleton and Getreu made the same misrepresentations when they made presentations to prospective clients.

Defendants also made a misrepresentation to RSSI that LGI could handle any business that RSSI could bring to the table. Defendants knew when they entered into the Agreement with RSSI that LGI did not process and pay even one customer utility bill; rather, Entech processed less than 1,000 utility bills for LGI's customers and LGI was not then in the business of paying customers' utility

18

bills. Being unfamiliar with the needs of the food service industry, Defendants had absolutely no basis upon which to determine whether Entech would be able to fulfill the needs presented by RSSI clients. The Court concludes that at the time the misrepresentation was made, Defendants were ignorant of the true needs of the clients RSSI brought to the table and ill-prepared to meet the challenges presented by those clients. Under the facts and circumstances, the misrepresentation was recklessly made by Defendants without regard to the truth, knowing RSSI would rely upon it.

**B.  Breach of contract**

Under Tennessee law, the essential elements of any breach of contract claim include: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract. <u>Ingram v. Cendant Mobility Fin. Corp.</u>, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). A plaintiff must prove similar elements under Minnesota law. <u>Industrial Rubber Applicators, Inc. v. Eaton Metal Prods. Co.</u>, 171 N.W.2d 728, 731 (Minn. 1969), *overruled on other grounds*, <u>Standslast v. Reid</u>, 231 N.W.2d 98 (Minn. 1975).

*1.  The Work for Hire Agreement*

Effective February 6, 2002, RSSI and LGI entered into the Work for Hire Agreement ("the Agreement"), an open-ended contract. (Pl. Ex. 1.) The parties do not dispute that they entered into this

19

Agreement or that it is an enforceable contract. Although the
parties exchanged versions of this Agreement before its execution,
Defendant Leischow drafted most of the contract language. The
Court construes any ambiguities in the Agreement against its
drafter, Leischow. <u>See</u> <u>Catlett v. Chinery</u>, 952 S.W.2d 433, 436
(Tenn. Ct. App. 1997); <u>Benson v. City of Little Falls</u>, 379 N.W.2d
711, 713 (Minn. Ct. App. 1986).

The Agreement provided:

> **1. DESCRIPTION OF SERVICES.** Beginning on February 6,
> 2002, RSSI will provide the following service,
> (collectively, the "Services"): to include but not
> limited to, Sales of LGI's Utilities Online Bill Auditing
> and Tracking System, Utility Procurement Services,
> management of energy brokers and Facility Engineering
> Assessments. (For the purposes of this agreement,
> "Utilities" shall mean Electric, Gas and Water
> utilities). RSSI will be required to provide ongoing
> account targeting, reporting and management assistance
> with all sales made by RSSI to customers in the
> Foodservice Industry as indicated on Addendum A.
> Addendum A lists chain restaurant accounts and
> distributors covered by this agreement as agreed to by
> both parties. Periodically, Addendum A will be reviewed
> to either add or delete the accounts listed on
> Addendum A. A forty-eight (48) hour period will be
> enacted to enable LGI to gather information from its
> company concerning any current involvement or activity it
> may have with all possible future additions to
> Addendum A. RSSI will represent LGI to the Foodservice
> Industry. LGI will have control over how its services
> are represented by RSSI.

(Pl. Ex. 1, ¶ 1.) The Agreement further provided that LGI would
pay RSSI as follows:

> **2. PAYMENT FOR SERVICES.** LGI will pay RSSI a commission
> fee based upon fifty percent (50%) of the Gross Margin
> derived on the sales of LGI's products and services
> (unless specifically noted and mutually agreed to in

advance on an account sales margin schedule basis) less
any previously issued retainers. (Example: Sale price of
$15.00 per meter carries a gross margin of 50% or $7.50.
RSSI's commission would be 50 percent of $7.50, which
equals $3.75). LGI will detail a sales margin schedule
from which commissions will be based and provide it to
RSSI. Should the cumulative monthly commissions be less
than $5000 per month, LGI will pay RSSI the amount of the
shortfall to be deducted from future commissions.
(Example: RSSI commission for first and second month is
$0.00 and LGI pays a retainer of $5000.00 in each of
these two months. In the third month RSSI's commission
due is $12,000.00, LGI pays RSSI $5,000.00, $12,000.00
less previous retainers of $10,000.00, plus and (sic)
additional retainer amount of $3,000.00. Had the third
month's commission due RSSI been $16,000.00, LGI shall
pay RSSI $6000.00, $16,000.00 less the previous retainers
totaling $10,000.00 of commission due and $0.00 in
retainer.) Commissions will be earned by RSSI in the
month the revenue from the sale is received by LGI.
Payment of all retainers will be contingent upon RSSI
meeting monthly activity levels, which shall be mutually
agreed upon in advance between LGI and RSSI.
Compensation shall be payable monthly, 10 days after the
end of each month. In the event that an account does not
pay LGI for the service, RSSI will not be compensated for
the unpaid portion of the invoice.

(Pl. Ex. 1 ¶ 2.)

The Agreement did not require LGI or Leischow to provide any
particular services or quality of services, nor did the contract
define the term, "gross margin." The interpretation of a contract
is a question of law and depends on the intent of the parties.
Pitt v. Tyree Org. Ltd., 90 S.W.3d 244, (Tenn. Ct. App. 2002);
Rosenberg v. Heritage Renovations, LLC, 685 N.W.2d 320, 324(Minn.
2004). The Court concludes the parties intended that Defendants
LGI and Leischow would provide RSSI clients with the products and
services actually sold to them, including timely and accurate

21

utility bill invoice processing and payment and use of SMRTPOWER. The parties intended that "gross margin" meant sales revenue less direct costs. As the parties also agreed, LGI charged direct costs against RSSI in the month the costs were incurred and RSSI earned commissions in the month revenue was paid. A commission payment was due to be paid ten days after the end of the month in which the commission was earned.

Pursuant to the Agreement, RSSI was to sell LGI's products and services to the food service industry, and RSSI was successful in doing so. LGI signed contracts with RSSI clients AFC Enterprises, Bruegger's, Cooker's, California Pizza Kitchen, Jack-in-the-Box, and Outback Steakhouse of Florida. RSSI also made the initial contact with Buffalo Wild Wings. Even after RSSI terminated the Agreement in June 2004, Stapleton and Getreu continued to provide support to RSSI clients until Leischow told them to stop making such contacts. The Court concludes that RSSI fulfilled its obligations under the Agreement.

The Court concludes that Defendants LGI and Leischow breached the Agreement in the following ways:

(1) Defendants failed to provide the customers in RSSI's portfolio with many of the products and services for which they contracted. By terminating the relationship with Entech and moving services in-house, Defendants destroyed the infrastructure to support the products and services RSSI sold to its customers.

22

SMRTPOWER was no longer available. The processing of invoices slowed down. Leischow hired another subcontractor, YSK, to scan invoices and electronically send them to India for keying to make them uniform. There were problems interfacing with India, resulting in customer complaints, invoices disappearing, late charges being imposed on customers by utility companies, and shut-off notices being sent. Unpaid invoices resulted in two or three Jack-in-the-Box restaurants being closed, one Outback location closed, and one Outback location's water being temporarily shut off. (Pl. Exs. 28, 31, 34, 36, 37; Trial Tr. 132-153.)

(2) LGI's termination of Entech resulted in expenses for system development to take invoice processing in-house at LGI. These expenses were not contemplated by RSSI and the Defendants at the time the Agreement was signed, and the parties agreed that developmental costs for the in-house system were not going to be charged to RSSI revenue to reach gross margin. (Trial Tr. 112-113.) These expenses were charged against RSSI revenues although RSSI had no control over the decision to dismiss Entech.

(3) Dissatisfaction with Defendants' services resulted in the early termination of the contracts with Bruegger's, Cooker's, AFC Enterprises and Jack-in-the-Box, resulting in loss of revenues. Due to Defendants' poor performance, CPK's fee payments were reduced.

23

(4) None of the contracts with RSSI clients were renewed due to Defendants' poor performance.

(5) After Defendants began itemizing costs and expenses to be deducted from revenues from the RSSI portfolio, Defendants refused to provide any documentation to verify those costs other than the commission statements created and provided to RSSI.

(6) Defendants kept increasing the categories of costs included as direct costs, including employees' salaries, outside contractors, Federal Express charges, and travel expenses, contrary to the parties' intent when the Agreement was signed. Defendants charged personal expenses against RSSI revenues, including a family vacation to Florida in 2002.

(7) Defendants charged all of the late fees incurred on the clients' utility invoices against RSSI revenues to reduce the commission fees. To the extent a customer did not send a bill on time, the late fee should have been the customer's responsibility. If the utility did not send the bill in time to be timely paid, it should not charge a late fee. If the late fee was due to a delay in processing or an error by LGI, LGI should have paid the late fee.

(8) Defendants underreported revenues received from RSSI clients.

(9) Defendants failed to timely pay commissions owed to RSSI. Pursuant to the Agreement, commissions were to be paid ten (10)

24

days after the end of the month in which the commission was earned by the receipt of revenue.

  2. *The amendment to the Work for Hire Agreement*

By July 2003, sufficient revenue was paid to Defendants by RSSI clients to permit RSSI to repay to LGI all previous monthly retainers (or "draws") that it had received. RSSI paid off all retainers in the amount of $57,594.08 to LGI by the end of September 2003. Pursuant to the Agreement, the parties had expected that when the retainers were repaid, Leischow would calculate LGI's true gross margin for the services and products furnished to the customers acquired by RSSI and give RSSI an actual gross margin figure, and each month LGI would pay RSSI fifty percent (50%) of the gross margin. Between inception of the Agreement in February 2002 and September 2003, Leischow did not provide RSSI with details as to how he calculated gross margin in spite of repeated requests for the information. The commission statements RSSI received showed 50% cost and therefore 50% gross margin, but the unstated calculations did not appear to be consistent. RSSI was given half of the gross margin stated by LGI up to September 2003, but Leischow did not provide any clear explanation or documentation to support the 50% gross margin. (Trial Tr. 389.)

In October 2003, LGI paid RSSI 50% of a stated gross margin of 27.39%. At that time, Leischow notified Stapleton and Getreu that

the income and gross margin was running lower than expected. Leischow sought a reduction in the commission percentage LGI would pay to RSSI. Although RSSI was under some pressure as a result of Leischow's demand to lower the commission rate, Stapleton and Leischow engaged in extensive negotiations in November and December 2003 in an effort to reach an agreement. The parties anticipated that Jack-in-the-Box would begin to make large fee payments in March 2004 as a result of substantial utility cost savings effectuated by LGI. (Def. Ex. 235.) In an attempt to bring these protracted negotiations to a conclusion, Leischow submitted a proposal to RSSI which the parties executed as a written letter Amendment to the Agreement effective December 16, 2003. The Amendment provided as follows:

> This letter is confirmation of how we will specifically handle our commission payments to RSSI as we move forward for management fee and savings fee determinations.
>
> LGI will pay commissions based upon a flat margin of 30% to RSSI beginning December 1, 2003. This commission rate will continue through the month of February provided there are no substantial (7%) changes to the RSSI account portfolio. Should there be substantial (7%) changes to the projected Revenue; LGI will recompute the margin level to determine if a change in Margin % is warranted. When and if the management fee and the savings revenues are as projected (*See attached revenue projections, Book3.xls delivered by LGI to RSSI on November 18*[th]) for March, the existing RSSI account portfolio margin will increase to approximately 50% and if this proves to be accurate, at that time LGI will change the RSSI commission payment plan to a flat rate of 25% of sales on all accounts, from that date forward. Demand projects are paid at 50% of the predetermined gross margin rate. All other provisions of Paragraph 2, Payment For Services, are still in effect.

> Any new business developed will pay at the rate of 25% of
> sales effective as of December 1, 2003.

(Pl. Ex. 2.) Thus, RSSI was to be paid at a flat rate of 15% of sales from December 2003 through February 2004, without taking direct costs into consideration, so long as revenues received on the RSSI portfolio were within seven percent (7%) (above or below) of the projected revenues as shown in the spreadsheet attached to the amendment. In the event actual revenues were more than 7% above or below projected revenues, Leischow would recompute the margin levels to determine whether a change in the percentage of sales paid as commission to RSSI was justified. In such an event, any change in the rate of commission payments was left to Leischow's sole discretion. However, the parties intended that any direct costs charged against RSSI's commissions would be directly incurred in conjunction with the RSSI portfolio.

Although Stapleton testified at trial that he believed this amendment was not enforceable because he signed it under duress, the Court concludes that Stapleton participated in the negotiations leading up to the amendment, and he knowingly and voluntarily entered into the amendment on behalf of RSSI in order to achieve an anticipated commission rate of twenty-five percent (25%) of sales starting in March 2004.[2] The benefit to RSSI of the potential 25% commission rate on the RSSI portfolio starting within three months

---

[2]The CPK contract began January 1, 2004 and was considered to be new business that was paid at the 25% commission rate.

27

and continuing for the life of those contracts, along with RSSI's agreement to redouble its efforts to sell to food service clients for LGI starting in December 2003, supplied the necessary consideration for the amendment. In his own communications with Defendants, Stapleton acknowledged that he had agreed to the amendment. (Pl. Ex. 73; Def. Ex. 334.) The Court concludes the amendment is enforceable and that it took effect on December 1, 2003.

From December through February 2004, LGI paid RSSI the flat 15% of sales commission rate[3] and did not itemize direct costs and calculate gross margin, although during this period RSSI did not provide LGI with 2004 sales target information as requested. LGI did not increase the commission rate to 25% of sales in March 2004 because Jack-in-the-Box refused to begin paying the anticipated savings fees.

Once RSSI terminated the Agreement and its amendment in late June 2004, however, Defendant Leischow recalculated gross margin for the months of January 2004 and after. In doing so he charged as direct costs to RSSI his salary and that of his assistant, even though the parties had agreed that such salary expenses would not be charged to RSSI. Leischow testified that he charged the increased expenses because Stapleton and Getreu were no longer

---

[3]LGI retroactively made a commission payment to RSSI so that the November 2003 commission was based on an assumed 30% of gross margin, or 15% of sales.

selling LGI's services to clients and Leischow was forced to take over the sales function of their jobs. Leischow applied 90% of his internal labor costs to RSSI's portfolio. RSSI had previously accepted this 90% attribution figure. (Pl. Ex. 2, attachment.) Leischow also charged against RSSI commissions additional business expenses which dropped RSSI's commission payments substantially from June 2004 and after. (Pl. Ex. 139.)

Under the amendment, Leischow in his sole discretion could have recalculated gross margin starting in March 2004 when Jack-in-the-Box failed to begin paying anticipated utility savings fees, rather than paying RSSI 15% of sales through May 2004. If Leischow was concerned that RSSI was not bringing in new clients, Leischow could have demanded that RSSI perform the Agreement or Leischow could have demanded renegotiation of the Agreement or negotiation of another amendment to the Agreement. However, neither the Agreement nor its amendment permitted Leischow to act punitively toward RSSI by going back to January 2004 and recalculating gross margin, charging against RSSI costs that the parties had not agreed could be so charged. Leischow attributed as many expenses as he could find to lower RSSI's commissions. Leischow's conduct breached the Agreement and its amendment, and his conduct had the effect of reducing the amount of commissions LGI paid to RSSI for the month of June 2004. Because Leischow continued to charge many

29

expenses to RSSI after June 2004 as well, RSSI commissions dropped in the ensuing months also.

## C. Defendant Leischow's personal liability

The Court determines that Defendant Leischow will be held jointly and severally liable with Defendant LGI. The Court relies on Brungard v. Caprice Records, Inc., 608 S.W.2d 585, 588 (Tenn. Ct. App. 1980), and Jasper Aviation, Inc. v. McCollum Aviation, Inc., 497 S.W.2d 240, 242 (Tenn. 1972), which state:

> One, who in the course of his business, profession or employment, or a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"In effect, the scienter requirement of common law deceit has been replaced by a reasonable care standard in business transactions. [citation omitted] Thus the plaintiff only needs to prove that the misrepresentations were made negligently." Brungard, 608 S.W.2d at 588. Here, the Court has determined that Defendant Leischow's misrepresentations were intentional in that he made them knowingly, without belief in their truth, or recklessly, careless whether they were true or false. See id. See also Universal Lending Corp. v. Wirth Companies, Inc., 392 N.W.2d 322, 326 (Minn. Ct. App. 1986) (noting corporate officer may be held liable in tort if the officer actually participated in the tortious transaction).

30

Moreover, at the time Defendant Leischow made the misrepresentations which induced RSSI to enter into the Agreement, Leischow knew he was operating as a sole proprietor doing business as The Leischow Group, Inc. That entity was not then, and never was incorporated. See <u>Woodall v. Underwriters at Lloyds, London</u>, 2007 WL 1231688 at *2 (E.D. Tenn. 2007) ("The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations.") Defendant Leischow is personally liable for his own acts and those of Defendant LGI.

**D. LGI's counterclaim**

The law set forth in section B. above on breach of contract applies equally to Defendants' counterclaim for breach of contract. The Court concludes under the facts determined above that Defendants proved by a preponderance of the evidence their breach of contract counterclaim against RSSI. As found in section I.B.5. above, LGI is entitled to $23,429 in damages on this claim.

**E. Damages**

With regard to fraud, the injured party should be compensated for the actual injuries sustained by placing him in the same position he would have occupied had the wrongdoer performed and the fraud not occurred. <u>Shahrdar v. Global Housing, Inc.</u>, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998). Under Minnesota law, "[t]he out-of-pocket rule allows damages to be recovered which are the natural

31

and proximate loss sustained by a party because of reliance on a misrepresentation. Under this rule it is not a question of what the plaintiff might have gained through the transaction but what was lost by reason of defendant's deception." <u>Lewis v. Citizens Agency of Madelia, Inc.</u>, 235 N.W.2d 831, 835 (Minn. 1975).

"The purpose of assessing damages in the event of a breach of contract is to place the injured party in the same position it would have been in had the contract been fully performed." <u>Metropolitan Gov't. of Nashville and Davidson County v. Cigna Healthcare of Tennessee, Inc.</u>, 195 S.W.3d 28, 35 (Tenn. Ct. App. 2005); <u>Kellogg v. Woods</u>, 720 N.W.2d 845, 853 (Minn. Ct. App. 2006). "Whether the theory of recovery is breach of contract, intentional misrepresentation, or promissory fraud, if the damages claimed under each theory overlap, the Plaintiff is only entitled to one recovery." <u>Allied Sound, Inc. v. Neely</u>, 909 S.W.2d 815, 821 (Tenn. Ct. App. 1995); <u>Brooks v. Doherty, Rumble & Butler</u>, 481 N.W.2d 120, 128 (Minn. Ct. App. 1992) ("In order to recover under theories of both contract and tort, appellant had the burden of proving separate damages for fraud and for breach, lest the damage award be duplicative.")

Although RSSI may have suffered damages proximately caused by Defendants' fraud that are different from the damages suffered as a result of breach of contract (i.e., loss to reputation, loss to future business), RSSI made no effort to quantify any such damages.

32

RSSI seeks unpaid commissions, treble damages under Tenn. Code Ann. § 47-50-114(d) for bad faith failure to make commission payments in a timely manner, lost revenues, and prejudgment interest.

### 1. *Plaintiff's calculation of damages*

Plaintiff RSSI presented two separate damages calculations: one completed by Plaintiff's expert Robert Whisenant, and one completed by John Getreu for RSSI. These two calculations are not themselves consistent, and each of them is based on critical flaws.

#### a. **Robert Whisenant's calculation**

The Court rejects Mr. Whisenant's calculation (Pl. Exs. 92 & 93) for several reasons. First, Mr. Whisenant testified that LGI failed to produce important documentation that would have allowed him to reconcile bank deposits and evaluate costs that LGI charged against RSSI revenue. (Trial Tr. 570-575.) Although Mr. Whisenant tried to apply uniform standard of accounting principles to determine the gross margin, he could not do so because of the state of the books and records that LGI turned over in discovery. (Trial Tr. 580.) He was unable to calculate actual gross margin due to the lack of information, and even if he had been able to do so, the resulting figures would have been very subjective. (Trial Tr. 581.)

Second, although LGI produced additional information after Mr. Whisenant completed his supplemental report in April 2007, Plaintiff's counsel did not provide that additional information to

33

Mr. Whisenant so that he could further update his analysis. (Trial Tr. 593.)

Third, as instructed by Plaintiff's counsel, Mr. Whisenant applied 50% gross margin throughout the period in question even though he read the amendment to the Work for Hire Agreement and recognized that the amendment did not state that gross margin would be calculated at 50% after December 1, 2003. (Trial Tr. 596-597.)

Fourth, LGI charged direct costs to RSSI in the month they were incurred (on an accrual basis) and counted collections of revenue in the month received (on a cash basis). Because Mr. Whisenant did not have proper documentation, he could not reconcile those books of LGI that he did have. (Trial. Tr. 598.)

Fifth, Mr. Whisenant assumed that each RSSI customer contract extended to the full 36-month life of the contract. He did not take into account that some of the contracts terminated early. (Trial Tr. 601-603.) For all of these reasons, the Court finds that Mr. Whisenant's expert findings and conclusions are not reliable and the Court does not rely upon them.

### b. RSSI's calculation

The Court also rejects the greater part of RSSI's calculation because it is based on two fundamental assumptions with which the Court does not agree.

Because LGI did not produce certain documentation during discovery, RSSI was forced to find some method by which to estimate

34

its damages. RSSI did not wish to accept LGI's position that 90% of LGI's internal labor costs were attributable to RSSI business because to accept this figure raises expenses and lowers profit and results in less commission to RSSI. (Pl. Ex. 122.) It is important to note that, at the time RSSI conducted its own audit of LGI in July-August 2004 after terminating its contract with LGI in June 2004, RSSI *itself* applied the 90% internal labor figure, observing in its audit that the figure had been agreed to by the parties. (Def. Ex. 253, Footnotes: "Internal Labor excludes Dean and Vicky, per agreement between parties. Labor adjusted to 90% for covered employees, per agreement between parties.") The 90% figure first appeared in the footnotes to the schedule of projected gross margin on RSSI's portfolio that was attached to the amendment to the Work for Hire Agreement. (Pl. Ex. 2.)

In an effort to circumvent RSSI's earlier agreement to the 90% internal labor figure, Stapleton and Getreu testified at trial that RSSI used, but did not accept the 90% figure, in preparing its own audit. (Trial. Tr. 312-313, 398-400.) The Court rejects such testimony because it is in direct contradiction to RSSI's earlier agreement to use the 90% figure.

To get around this quandary in preparing for the bench trial, RSSI focused on Leischow's representation that LGI processed 150,000 utility invoices for clients per month. The trial record now makes clear that Leischow's representation was not true.

35

Nonetheless, RSSI determined the number of utility invoices LGI actually processed for RSSI clients and compared that number as a percentage to the 150,000 invoices Leischow claimed he was handling. Thus, RSSI determined that only 9.77% of LGI's internal labor costs should be charged to RSSI business rather than 90% as the parties agreed. This contradicts LGI's evidence that 90% of its internal labor cost is attributable to RSSI. (Trial Tr. 733-739; Def. Ex. 324.)

Additionally, RSSI obtained an affidavit that Leischow submitted in related litigation in Minnesota in which Leischow claimed that he managed 13,000 units. RSSI calculated the number of units attributable to its clients and compared that figure to Leischow's claimed 13,000 units to reach the conclusion that RSSI was responsible for 21.52% of LGI's total units. (Trial Tr. 332-333, 352, 400-408, Pl. Ex. 114.) The Court rejects this analysis as well. RSSI produced no evidence to substantiate the 13,000 figure, and Leischow testified that the total number of locations LGI manages may not utilize the same bill paying and processing as is done for RSSI clients. LGI provides various services to various clients. (Trial Tr. 739-740.)

Stapleton testified that RSSI does not know what percentage of LGI's internal labor was dedicated to RSSI's accounts, but 9.77% was the best number RSSI could come up with to show the amount of time LGI spent on RSSI's accounts. (Trial Tr. 334-335.) The

36

difference in the two percentages advanced by the parties (9.77% vs. 90%) would have a huge impact on the damages calculation.

The Court rejects RSSI's approach to the calculation of damages because it is not supported by the evidence. The Court will accept certain aspects of RSSI's calculation of damages as explained below.

### 2. LGI's calculation of damages

LGI presented a damages calculation through its expert, Harold Dahl. According to Mr. Dahl, from the inception of the Work for Hire Agreement through October 2003, the "commission" payments LGI paid to RSSI were predicated on retainers, or draws, and not on a calculation of actual gross margin. During those months, gross margin was actually negative because early on the costs exceeded the cash received. Nonetheless, LGI paid RSSI $5,000 per month no matter what actual gross margin was for that month. (Trial Tr. 790.) LGI does not seek reconciliation of these figures, and the Court finds that RSSI is not entitled to any additional commissions for this period.

Mr. Dahl calculated damages for the period March 2004 to April 2007. The summary of his calculation is found at Exhibit H within Defendant's Exhibit 326. Although Mr. Dahl testified about a number of figures and exhibits, the Court understands his testimony to rest on the following premise: In March 2004, the parties expected that Jack-in-the-Box would begin paying substantial

37

utility savings fees (approximately $134,000 per month); Jack-in-the-Box failed to begin paying the utility savings fees as expected, but Jack-in-the-Box did finally pay the fees owed to LGI as a result of the arbitration award of $1,879,354, albeit later than on the due date; therefore, to ease calculation of damages, the parties and the Court should assume that Jack-in-the-Box began paying the savings fees as expected in March 2004; and LGI's ultimate receipt of the Jack-in-the-Box revenue triggered the provision in the amendment to the Work for Hire Agreement requiring LGI to pay RSSI commissions of 25% of revenue from March 2004 forward. By calculating 25% of cumulative revenue as provided in the amendment, the need to calculate actual gross margin is obviated. This was the obvious intent of the parties at the time the amendment was agreed upon. Moreover, additions and deductions can be made to the commission figures to resolve other disputed issues.

Considering the extremely complicated record in this case, the Court agrees with Mr. Dahl that this approach should be taken. The amendment to the Work for Hire Agreement permitted LGI to renegotiate gross margin for March 2004 forward if RSSI revenues were not within 7% of the projection. When this target was missed, Leischow did not seek a renegotiation of the commission rate. Rather, in June 2004, he, in his own discretion, calculated gross margin back to January 2004 and started charging his and an

assistant's salaries and other additional expenses to RSSI revenues. The Court has already found that Leischow's method was arbitrary and improper under the evidence. Because LGI's own expert suggests that the 25% of revenue calculation be used, the Court finds under all of the circumstances that this is the correct approach.

Although the Court agrees with his general methodology, it does not, however, follow Mr. Dahl's Exhibit H in all respects. First, the Court calculates the initial amount of cumulative revenue differently because the Court treats the Jack-in-the-Box arbitration award separately and does not include it in the initial cumulative revenue figure for LGI. Second, the Court finds that LGI is not entitled to any of the "mitigating expenses" in the amount of $145,949 charged against RSSI's commissions for abandoning their customers. The Court has found that Stapleton and Getreu continued to support RSSI clients even after they terminated their Agreement with LGI, and they would have continued to do so if Leischow had not forbidden them to contact clients as early as July 2004. Thus, the Court sees no basis upon which to award LGI "mitigating expenses" which were supposedly incurred by LGI to "take up the slack" after RSSI terminated its Agreement. Many of these expenses LGI brought upon itself as a result of its own selfish conduct.

Because the Court will treat the Jack-in-the-Box arbitration award separately, the Court will consider in connection with that calculation deductions for the costs incurred by LGI in obtaining the award. The Court finds that the proper figure for the Jack-in-the-Box arbitration award is the amount that was actually paid to LGI, which included interest ($1,879,354). There is no dispute that RSSI brought Jack-in-the-Box to LGI as a customer, and RSSI is entitled to its share of the arbitration award and the interest allowed, the same as LGI. The interest portion of the award should not benefit LGI only.

The Court further finds that $192,222 should be deducted from the arbitration award to account for legal expenses and travel costs. To reach this figure, the Court finds that $8,114 of the $196,788 in expenses claimed by LGI as incurred in obtaining the Jack-in-the-Box award were the result of non-Jack-in-the-Box legal fees. As such, that amount will be deducted ($196,788 less $8,114 = $188,674). Travel expenses in the amount of $3,548 will be allowed ($188,674 + $3,548 = $192,222). Accordingly, the gross margin on the Jack-in-the-Box award is $1,687,132 ($1,879,354 less $192,222). RSSI is entitled to 25%, or $421,783. To avoid double-counting, the Court will add $127,253 to RSSI's entitlement, which represents legal expenses previously charged against RSSI commissions, and $3,548, which represents the travel expenses previously charged against RSSI commissions (Pl. Ex. 110) for a

total of $552,584. The Court will subtract the amount of $255,332, which represents the amount that LGI had already paid to RSSI in commission from the Jack-in-the-Box award. This results in RSSI's entitlement to an additional $297,252 from the Jack-in-the-Box award ($552,584 - $255,332 = $297,252).

The Court rejects Mr. Dahl's inclusion of $99,296 for expenses Leischow claims he incurred in connection with the arbitration of the CPK contract. Leischow arbitrarily determined this figure. Mr. Dahl simply took the figure at face value because it was supplied by Leischow and applied it in his calculation. Because the figure is not substantiated, the Court will not use it. The Court does find in LGI's favor on the issue of RSSI's interference with the CPK contract; however, the Court adopts and applies LGI's loss figure of $23,429 for RSSI's breach. (Def. Ex. 332.)

The Court finds that RSSI is entitled to $14,367 for commissions earned from Buffalo Wild Wings (25% of $57,466). The Court will also give RSSI credit for $131,233 in lost revenue for the early cancellation of the AFC, Outback, Bruegger's and Cooker's contracts. (Pl. Ex. 132.) The Court will not award RSSI $176,176 for unreported revenue (Pl. Ex. 132) because RSSI did not carry its burden of proof to show how this amount was calculated. The Court will deduct the June 2007 payment LGI made to RSSI in the amount of $87,003, and the amount LGI is due on its counterclaim of $23,429.

41

Finally, RSSI seeks statutory trebling of $306,990 in commissions which LGI failed to pay in a timely manner in bad faith, pursuant to Tenn. Code Ann. § 47-50-114(d). (Pl. Ex. 132.) Defendants are subject to the court's jurisdiction pursuant to this statute although they are Minnesota citizens. Tenn. Code Ann. § 47-50-114(e). The Court finds that Defendants contracted with RSSI as its sales representative to solicit orders for LGI's products, including SMRTPOWER, utility usage reports, and demand-side analyses. Tenn. Code Ann. § 47-50-114(a)(2).

The Court finds that LGI acted in bad faith when it failed to pay commissions to RSSI in a timely manner as required by the statute. The Court's calculation takes into account that RSSI has already been paid $306,990 in commissions. Therefore, the Court will multiply that amount by two ($306,990 x 2 = $613,980) to reach statutory trebling of the commission amount.

Thus, the Court calculates damages as follows:

42

```
Cumulative Revenue of LGI to May 2006    $1,562,229
CPK revenue May 2006 to April 2007          151,987

Total Cumulative Revenue                 $1,714,216

Commission to RSSI at 25% of revenue        428,554

Commissions already paid                   (377,113)
  (includes Feb. 2007 payment of $255,332)

Commissions owed                         $    51,441

RSSI share of Jack-in-the-Box award      $   297,252
 ($552,584 - $255,332 = $297,252)

Buffalo Wild Wings commission due        $    14,367

Loss of Revenue from cancellation of
 contracts                               $   131,233

Trebled commissions
  (T.C.A. 47-50-114(d))                  $   613,980

Total Due                                $1,108,273

RSSI's interference with CPK               (23,429)

LGI's June 2007 payment                    (87,003)

Grand Total                              $   997,841
```

The Court finds that RSSI is entitled to prejudgment interest on portions of the damages award. The amounts of various types of damages are ascertainable by computation. <u>Myint v. Allstate Ins. Co.</u>, 970 S.W.2d 920, 927 (Tenn. 1998). The Court finds that an award of prejudgment interest is fair under the circumstances of this case to fully compensate RSSI for the loss of use of funds to which it was legally entitled, and the Court does not make the award of prejudgment interest in order to punish the Defendants. <u>See</u> <u>id.</u>; <u>Scholz v. S.B. Int'l, Inc.</u>, 40 S.W.3d 78, 83 (Tenn. Ct.

43

App. 2000). This is not a case in which an award of prejudgment interest might be inappropriate. <u>Scholz</u>, 40 S.W.3d at 83. RSSI has not been so inexcusably dilatory in pursing a claim that consideration of a claim based on loss of the use of the money would have little weight, nor has RSSI unreasonably delayed the proceedings after suit was filed, nor has RSSI been compensated otherwise for the lost time value of its money. <u>See</u> <u>id.</u>

The parties' Work for Hire Agreement and its amendment did not address the issue of prejudgment interest on a judgment obtained following litigation on the contract. Tennessee statute provides that, for all written contracts, the maximum effective rate of interest is the applicable formula rate. Tenn. Code Ann. § 47-14-103(2). The "formula rate" means:

> an annual rate of interest four (4) percentage points above the average prime loan rate (or the average short-term business loan rate, however denominated) for the most recent week for which such an average rate has been published by the board of governors of the Federal Reserve System, or twenty-four percent (24%) per annum, whichever is less[.]

Tenn. Code Ann. § 47-14-102(6). The "applicable formula rate" is the greater of the "formula rate" in effect at the time or the "'formula rate' last published in the Tennessee Administrative Register prior to such time, pursuant to § 47-14-105." Tenn. Code Ann. § 47-14-102(2). Historically, the "formula rate" gradually increased four percentage points between mid-July 2004 to the

present.[4]  The current "formula rate" as of September 24, 2007, as announced by the Tennessee Department of Financial Institutions, is 12.11 percent (12.11%) per annum.

The Court finds that RSSI is entitled to prejudgment interest on unpaid commissions of $51,411 and lost revenue of $131,233 (for a total of $182,644) beginning July 2004, after the Work for Hire Agreement and its amendment terminated.  Based on the historical "formula rate" data available, the Court calculated an average "formula rate" for one half-year in 2004 (8.71%), 2005 (10.37%), and 2006 (11.73%).  The "formula rate" was 12.25% for the first 8 3/4 months of 2007, and dropped to 12.11% on September 24, 2007. The Court finds that RSSI is entitled to receive total prejudgment interest of $73,450.58 on unpaid commissions and lost revenue ($7,788.10 in 2004; $19,747.81 in 2005; $24,654.10 in 2006; $20,699.12 for the first 8 3/4 months of 2007; and $561.45 for the week of September 24-30, 2007).

The Court further finds that RSSI is entitled to prejudgment interest on its share of the Jack-in-the-Box award from December 2006 to the present (10 months), as LGI deposited Jack-in-the-Box's payment of the arbitration award in the LGI bank account on November 28, 2006.  (Pl. Ex. 94 Nov. 2006 bank statement.)  The "formula rate" was 12.25% until September 24, 2007, when it dropped to 12.11%.  Thus, the Court finds that RSSI is entitled to

_____

[4]www.tennessee.gov/tdfi/rates/historical_listing_of_forumula_rate.html.

prejudgment interest on its additional share of the Jack-in-the-Box arbitration award ($297,252) of $29,820.33.

The Court further finds that RSSI is entitled to prejudgment interest on unpaid Buffalo Wild Wings commissions ($14,367) from January 2005 (one month after LGI started invoicing Buffalo Wild Wings for payment) to the present. Using the same "formula rates" noted above for the years at issue, the Court finds that RSSI is entitled to a total of $4,950.45 in prejudgment interest ($1,489.86 in 2005; $1,860.03 in 2006; $1,561.63 for the first 8 3/4 months in 2007, and $38.93 for the week of September 24-30, 2007).

The Court does not award prejudgment interest on the trebled commissions. Accordingly, RSSI is entitled to total prejudgment interest on the judgment of $108,221.36.

### IV. CONCLUSION

For all of the reasons stated, the Court finds in favor of RSSI on the misrepresentation, breach of contract, and statutory violation claims. The Court finds in favor of LGI on its claim that RSSI breached the Work for Hire Agreement by interfering in LGI's contract with California Pizza Kitchen. When damage for RSSI's claims and LGI's counterclaim are offset, the Court finds that RSSI is entitled to a judgment of $997,841.00 in damages, plus prejudgment interest of $108,221.36, for a total judgment of $1,106,062.36. Defendants Leischow and LGI are jointly and severally liable for these amounts.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE